IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

LLOYD B. WILLIAMS,

      Petitioner,

    v.

WARDEN, NORTH CENTRAL
CORRECTIONAL INSTITUTION,

      Respondent.

CASE NO. 2:13-CV-0024
JUDGE MICHAEL H. WATSON
Magistrate Judge Elizabeth A. Preston Deavers

## REPORT AND RECOMMENDATION

Petitioner, a state prisoner, brings the instant petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. This matter is before the Court on Respondent's *Motion to Dismiss*, Petitioner's *Traverse,* Respondent's *Reply*, and the exhibits of the parties. For the reasons that follow, the Magistrate Judge **RECOMMENDS** that Respondent's *Motion to Dismiss,* Doc. 9, be **GRANTED** and that this action be **DISMISSED.**

**Facts and Procedural History:**

This action involves Petitioner's convictions after a jury trial in the Jefferson County Court of Common Pleas on one count of felonious assault. The Ohio Court Seventh District Court of Appeals summarized the facts and procedural history of this case as follows:

> On July 7, 2010, the Jefferson County Grand Jury indicted Williams for one count of felonious assault (R.C. 2903.11(A)(1)), a second-degree felony. On July 16, 2010, Williams was arraigned, appointed counsel, and pled not guilty.
>
> On February 15, 2011, the case came before the court for a jury trial. The State called Officer John Lemal, who testified that he works for the Steubenville Police Department in the patrol division. On May 10, 2010, he was called to a residence at 826 Pekruhn Court around 9 or 9:30 a.m. When he arrived at the house, he saw Williams, the victim Sheila Thorn, and Thorn's daughter on

1

the porch area. He described the parties as upset and explained that the daughter appeared the most upset. He explained that Williams was intoxicated and was drinking from a bottle of Wild Irish Rose. Officer Lemal stated that he did not see any injuries on Williams.

Officer Lemal testified that Thorn had a large laceration on the left side of her face by her eye that was beginning to swell. He said that she was in bedclothes and it appeared that she had just woken up. He explained that backup arrived at some point, but initially he was on the scene by himself for several minutes. He separated Williams from Thorn and her daughter; he took Thorn and her daughter on the porch and Williams was inside the house. He testified that both Thorn and her daughter said that Williams was the cause of Thorn's injuries.

After the backup officer arrived, Officer Lemal placed Williams under arrest [*sic*] had obvious injuries. Officer Lemal testified that at that point, Williams started yelling to her, "Tell him that I didn't do it on purpose." Officer Lemal stated that it was clear that Williams knew that Thorn had been injured. The backup officer then transported Williams from the scene. Officer Lemal also stated that he did not locate any object in the house that might have been used to strike Thorn, but he explained that was not his primary concern.

On cross-examination, Officer Lemal agreed that according to his report, his initial thought was that Thorn was struck by an object. He did not believe her injuries were from a fist and he explained that the injury looked as though something had cut her. He confirmed that the house did not appear to be in disarray. He explained that because he was the primary responding officer, he did not perform more than a brief interview with any of the parties.

Officer Lemal testified that he was at the scene for approximately 15 minutes, and during that time, Williams did not fight or resist the officers. He confirmed that while Williams was being led away, he was making accusations about Thorn using or selling drugs. The officer stated that he did not observe any signs of intoxication from Thorn. He did not ask her if she had been using drugs or drinking either that day or the night before.

On redirect, Officer Lemal testified that although Williams was not physically resisting, his behavior was erratic. Williams was initially charged with domestic violence, but that charge was elevated to felonious assault due to the injury.

On recross, the officer testified that to his knowledge, Williams did not enter any area of the house to tamper with evidence or do anything to hinder the investigation.

The State then called Dr. Ravinder Chopra, who testified that he has worked as a physician at the Trinity Medical Center emergency room for over 25 years. Dr. Chopra testified that he provided care to Thorn at the West campus on May 10, 2010. He reviewed State's Exhibit 1, the medical record for the services provided to Thorn. He stated that Thorn arrived at the emergency room at 10:32 a.m. Regarding her injuries, he explained that Thorn presented to the emergency department due to a laceration on the left side of her face, and he ordered a CT of her facial bones. Dr. Chopra further testified that the medical report indicated that Thorn had blunt facial injuries, a fractured orbit, a fractured nasal bone, and laceration to the face. He explained that the CT showed that the bone next to Thorn's eye was shattered and as a result, there were some bony fragments just below her eye.

Dr. Chopra testified that the report indicated that Thorn was "struck by an unknown object in the face." He said that Thorn was transferred from Trinity West to Pittsburgh.

On cross, Dr. Chopra testified that Thorn had a history of arthritis and fibromyalgia. He stated that the report showed that Thorn was taking Paxil, Xanax, and Lyrica at the time of her admission. Paxil is an antidepressant, Xanax is for anxiety, and Lyrica is for pain. Counsel then asked whether Thorn denied any drug or alcohol use as far as her social history, and Dr. Chopra replied that she denied any drugs or alcohol. Dr. Chopra also testified that Thorn had broken bones and swelling, and the swelling could have resulted from chronic sinus problems. However, on redirect, he stated that Thorn's broken bones around the nasal passages and orbit were acute.

The State next called Sheila Thorn. She testified that in May of 2010, she lived with her daughter Olivia, who is now 12, and Williams. She explained that at that point, Williams had been living with her for about eight months. She stated that on May 9, 2010, which was Mother's Day, she and Williams were bickering because she drove a neighbor, Eric Montgomery, to buy dog food at Kroger, and Williams found out about this. She explained that after they got the dog food, she dropped off Eric and went to her house.

Thorn testified that when she got to her house, her neighbor Derrick Brown and his mother Tammy Brown were there, and Williams was cutting Derrick's hair. She explained that that all three were drinking liquor and she took a couple shots. She said that later on, Eric came over and Derrick was still there at that point. They were drinking vodka and beer, and she was drinking beer. She stated that Williams made sandwiches for Eric and Derrick. Later in the evening, Eric and Derrick left her house, and then just she and Williams were there.

Thorn explained that Williams left the house around 10 or 10:30 p.m., and then she was home alone. Olivia came home around 11 or 11:30 p.m., and then she and Olivia went to bed in their respective bedrooms. Thorn explained that Olivia was supposed to go to school the next day on Monday, May 10, and she stated that usually she gets Olivia up at 6 or 6:30 a.m. Thorn explained that she tried to wake Olivia up, but she said she was sick, so Thorn decided to let her stay home from school and go back to sleep. She stated that Williams was not home at that point. Thorn also went back to sleep in her room.

Thorn testified that the next thing she remembers is God telling her she was not going to die and telling her to wake up. She stated that she sat up and blood started pouring out of her face. She confirmed that when she thought she heard God's voice, she heard it after she felt the hit, which felt like a sledge hammer to her head. She stated that her left eye was "crooked" and she had her comforter over her face. She also confirmed that when she came to, she saw Williams from his legs down and his feet were going out of the bedroom. She explained that he came back into the room while she was still in bed and hit her four more times in her cheek area. After that, she explained that she believed she was looking for her phone and could not find it, and then Williams told her to go wash herself off and to wash the comforter. Thorn stated that she got up to wash off and she put the comforter in water.

Thorn testified that Olivia saw her and screamed. She explained that Williams wanted Olivia's cell phone, although he ended up giving it back to Olivia and Thorn motioned for her to call the police. She said that Olivia went into her room and she must have called the police. Thorn further explained that Williams saw Olivia on her phone and told her to give it to him. Thorn stated that she also tried to push the panic button on her alarm system to call the police.

4

Thorn testified that the police arrived about 10 or 15 minutes later. She stated that an ambulance came to her house, but she refused to go to the hospital by ambulance. The police took Williams away, and then her neighbor drove her and Olivia to Trinity West where she was treated in the emergency room.

She explained that after the doctors saw her MRIs, they said she had more facial damage than they expected, so she was taken by ambulance to Allegheny Trauma Center. She confirmed that she had a cut on her face, and she stated that she was put under and stitched up. She testified that the doctors could not perform surgery on the fractures of her eye socket and nose because the bones were shattered. She explained that she still has shattered bone fragments in her face today and the doctor told her that she might need plastic surgery.

Finally, when asked if she was ever able to see the object that hit her the first time, she replied that she did not know what hit her.

On cross-examination, Thorn testified that when Officer Lemal arrived at her house, Williams let him in and she was still inside in her underwear. She agreed that when she first spoke with the officer on the scene, she indicated that she was struck with an unknown object and she did not mention anything about being struck again to the officer at that time. She further confirmed that at the emergency room she said she was struck with an unknown object and she did not mention being struck again. Thorn explained that she was hit twice, but she does not know what she was hit with the first time because she was asleep. She further explained that she did not tell the officer that she was hit again because there was not much time to say anything and the officer was trying to get Williams out of the house and did not really care about her.

Thorn admitted that she was drinking and used marijuana on May 9. She confirmed that she was prescribed Xanax, Lyrica, and Paxil, but she did not have a chance to take them yet at the time of the incident. Thorn also admitted that she had been convicted of tampering with records, falsification, and theft.

She confirmed that she and Williams were already in a romantic relationship prior to him moving in. Furthermore, she agreed that when their friends were over before the incident, "things were going fairly harmoniously."

On redirect, Thorn agreed that the officers and hospital personnel asked her that the second time she was hit, she knew that it was a

fist that struck her. She confirmed that she did not consume any alcohol, medication, or drugs on May 10th prior to the time she was struck.

Regarding her prior convictions, she explained that the offense was in 1998 and involved a theft of welfare benefits.

Next, the State called Detective John Lelless of the Steubenville Police Department, who testified that he took photographs of Thorn on May 12, 2010. The detective identified State's Exhibit 2 as the authorization for release of medical records signed by Thorn for Trinity Medical Center West and Exhibit 3 as copies of the photographs that he took. The State then moved to admit its Exhibits 1, 2, and 3, and rested its case. The defense objected to part of the documents in Exhibit 1, and the court admitted all of the exhibits over the objection. The defense then moved for a judgment of acquittal pursuant to Crim.R. 29(A), which the court overruled.

The defense called Williams, who testified that on May 9, 2010, Derrick came over in the late afternoon for a haircut. He explained that he got in contact with Thorn over the phone to ask her to come home because they had plans for Mother's Day. He also explained that Thorn had previously made six to seven trays of lasagna and he was calling her to ask what they were going to do with the lasagna.

Williams testified that Thorn returned home around 5:30 or 6 p.m. He explained that their neighbor Tammy came over to watch Derrick get his haircut, and she brought a fifth of Crown Royal. He testified that at one point, he discovered Thorn and Eric on the porch talking, and Thorn had brought him a slice of lasagna. Williams said that he knew Thorn and Eric had been together earlier in the day. Williams testified that Eric left to go home, and then later returned to their house.

Williams testified that it was around 6 p.m. at this point and everyone was taking shots. He stated that they smoked a couple "weed blunts," and then Thorn went to the store to purchase more alcohol and pick up Olivia and her friend from the movies. He explained that while she was gone, he finished cutting Derrick's hair and then he, Eric, and Derrick began playing cards. Then while they were playing cards, Thorn returned with the girls. He explained that Thorn joined the game and they played until around 11:30 p.m. He also stated that Tammy left the house at some point. Then Derrick left, and he, Eric, and Thorn continued to drink and

6

smoke marijuana. He stated that Eric left, and then his friend Virgil picked him up after 12 a.m. to purchase alcohol.

Williams explained that he and Virgil returned to his house and then sat in the yard for around two hours and drank vodka. They also snorted coke. He explained that they then left the house and split up by Market Square. Williams said that he returned home around 8 a.m., and he was stopped by a police officer on the way home.

Williams testified that when he got home, Thorn was awake, and they had a discussion about what she had done the day before. He claimed that he told Thorn to give him her marijuana and scales so that he could take it out of the house and hide it somewhere. Williams then testified that he "took a hit of some substance and [he] freaked out." He further explained:

"All I know is something took place in her bedroom. I didn't have nothing. I didn't throw anything and she said I was—she said 'I'm bleeding.' I'm like—I don't—I'm not—I don't know if I'm believing her or not and we just—just continued to keep talking.


* *

"I don't know—I mean, at the time I was—I was still getting high. I was using. Earlier that morning this had—we took—we hit us some crystal meth on some marijuana and I was constantly hearing voices and footsteps running behind me, this and that and somehow, this and that, I don't know—I don't even know where I got the—the Wild Irish Rose from that I had."

Williams testified that he then called the police and asked to speak to Captain Young. He told Captain Young that he was not sure if the captain was the officer who he spoke to on his way home. Williams said that he needed to speak to him about something in private because he did not want to put anyone's business out there in regards to what was said to him on his way home. Williams explained that he did not want the captain to speak Thorn's name out loud in case somebody was walking by, so he asked him for another number and Captain Young gave him an extension number. He further explained that Thorn kept pushing the phone away when he tried to give it to her, and he stated that she was holding a black towel to her face.

7

Counsel then asked Williams how Thorn sustained the injuries to her face, and Williams responded, "I take it I must have did it. I had—I must have did it but I would have never threw or hit her with nothing. * * * I don't know what happened. Alls I know is she said 'I'm bleeding. Would you give me a rag?' And at first I didn't understand what she was saying." Williams confirmed that the only people in the house at this point were himself, Thorn, and Olivia. He also agreed that it would be "unusual, if not impossible" for Thorn to give herself the injuries and stated that Olivia did not cause the injuries. Williams further testified: "I must have swung at her, swung my hand at her or something. I don't know." Finally, Williams testified that on the date of the incident, he had no reason to be angry at Thorn.

On cross-examination, the prosecutor asked whether Williams was the one who hit Thorn, and he responded, "Not knowingly." Williams explained that when he said he took a hit of a substance and "freaked out," he meant that he was hearing things and footsteps were running behind him. When asked if these effects were due to his drug and alcohol consumption, he replied, "I don't know. I got a history of hallucinating. I've been a mental health patient since I was 20 years old. I supposed to be on medication." Williams confirmed that he took all the drugs and alcohol on his own.

Williams stated that he did not know that Thorn was hurt until the day he went to court and saw her. He also admitted that he had continued to talk to Thorn since the time he has been in jail. When asked if he told her what to say on the stand, he said, "I didn't tell her—I told her how—how exactly what it went, that she wasn't asleep and she wasn't. She was talking to me."

Williams confirmed that he had a prior criminal record, including a conviction for drugs and a conviction for attempted felonious assault.

The defense next called Tammy Brown, who testified that she was at Thorn and Williams' house on May 9, 2010. She explained that Thorn arrived and offered her some lasagna she had cooked for Mother's Day. She stated that she left around 6 p.m., and there were no problems while she was there.

The defense then rested and moved for admission of Defendant's Exhibit 1. The defense requested a jury instruction on the lesser included offense of assault, which the court overruled.

> Following deliberations, the jury found Williams guilty of felonious assault (R.C. 2903.11(A)(1)).
>
> Following a sentencing hearing, the trial court issued a judgment entry on February 18, 2011, sentencing Williams to eight years of incarceration and ordering him to pay restitution of $786.63. The court also imposed a lifetime weapons disability upon Williams and notified him that he would be subject to post-release control for a period of three years upon his release from prison.

*State v. Williams*, No. 11 JE 3, 2012 WL 1307084, at *1-6 (Ohio 7th App. Dist. March 29, 2012). Petitioner filed a timely appeal, asserting that the evidence adduced at trial was constitutionally insufficient evidence to sustain his conviction; that his conviction was against the manifest weight of evidence; and that the trial court erred by failing to give a jury instruction on the lesser included offense of assault. On March 29, 2012, the appellate court rejected these arguments, affirming the trial court's judgment. *Id.* Petitioner did not timely appeal to the Ohio Supreme Court. On July 25, 2012, the Ohio Supreme Court denied his motion for a delayed appeal. *State v. Williams*, 132 Ohio St.3d 1481 (2012).

On December 28, 2012, Petitioner filed the instant *pro se* petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Petitioner asserts he was denied effective assistance of trial and appellate counsel because his trial counsel failed to investigate, call defense witnesses and or obtain "evidence to present to the court." *Petition*, PageID #5. Petitioner additionally asserts that appellate counsel improperly failed to raise on appeal an issue regarding the ineffective assistance of trial counsel and failed to confer with Petitioner prior to deciding which issues to raise on appeal. It is the position of the Respondent that these claims are unexhausted and/or procedurally defaulted because Petitioner failed to present these claims to the state courts.

**Exhaustion:**

Before a federal habeas court may grant relief, a state prisoner must exhaust his available remedies in the state courts. *Castille v. Peoples*, 489 U.S. 346, 349 (1989); *Silverburg v. Evitts*, 993 F.2d 124, 126 (6th Cir. 1993). If a habeas petitioner has the right under state law to raise a claim by any available procedure, he has not exhausted that claim. 28 U.S.C. § 2254(b), (c). Moreover, a constitutional claim for relief must be presented to the state's highest court in order to satisfy the exhaustion requirement. *O'Sullivan v. Boerckel*, 526 U.S. 838 (1999); *Manning v. Alexander*, 912 F.2d 878, 881 (6th Cir. 1990). Where alternative state remedies are available to consider the same claim, exhaustion of one of these remedies is all that is necessary.

As noted by the Respondent, the record indicates that Petitioner never raised either of the claims he now presents for review to the state courts.  As to his claim of ineffective assistance of appellate counsel, Petitioner may still seek to establish good cause for an untimely filing of an application under Ohio Appellate Rule 26(B)(2)(b).  As to his claim of ineffective assistance of trial counsel, Petitioner may still pursue a delayed appeal under Ohio Appellate Rule 5(A).[1] Because both of these remedies remain available to Petitioner, and because he has failed to indicate any reason for failing to pursue such actions, this Court concludes that Petitioner's claims remain unexhausted, and this action is subject to dismissal without prejudice on this basis.[2]

---

[1] Petitioner must present any off-the-record claim of ineffective assistance of trial counsel in a petition for post conviction relief pursuant to O.R.C § 2953.21.  The time period has long since expired for the filing of such action.  Moreover, the record fails to reflect that Petitioner can meet the stringent requirements for the filing of a delayed post conviction petition under O.R.C. § 2953.23.

[2]  Respondent argues that Petitioner's claims are procedurally defaulted as well as unexhausted, and that Petitioner's claims should be dismissed as procedurally defaulted.  Respondent argues that nothing in the record suggests that Petitioner can meet the requirements for consideration of

Still, the record reflects that both of Petitioner's claims plainly lack merit: 28 U.S.C. § 2254(b)(2) provides that an application for a writ of habeas corpus may be denied on the merits, notwithstanding a Petitioner's failure to exhaust state court remedies. Because Petitioner's claims both are plainly without merit, and because the re-filing of this petition after exhaustion likely would be time-barred in any event, in the interests of judicial economy, this Court will consider Petitioner's claims on the merits.

Nearly forty years ago, the United States Supreme Court reiterated that the right to counsel guaranteed by the Sixth Amendment to the U.S. Constitution is the "right to effective assistance of counsel." *Strickland v. Washington*, 466 U.S. 668, 686 (1984). To prevail on a complaint of ineffective assistance of counsel, a defendant must meet the now-familiar two-prong *Strickland* test:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

*Id*. at 687. The Supreme Court emphasized that "[j]udicial scrutiny of counsel's performance must be highly deferential." *Id*. at 689. Put plainly, "[a] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance . . . ." *Id.*

---

his claims in a delayed appeal or Rule 26(B) application or, for that matter, in an untimely petition for post conviction relief. *See* Respondent's Reply. This Court will not address these arguments, however, nor will the Court address Petitioner's arguments regarding the reasons for his failure to raise or delay in pursuing state court action, as Petitioner's claims plainly lack any merit.

11

Moreover, "[a]n error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Strickland*, 466 U.S. at 692. Rather, a defendant must demonstrate prejudice to prevail on a claim of ineffective assistance of counsel. *Id*. at 693. To do so, a defendant must establish that a reasonable probability exists that, but for counsel's errors, the result of the proceedings would have been different. *Id.* at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* Because a defendant must satisfy both prongs of the *Strickland* test to demonstrate ineffective assistance of counsel, should the court determine that she has failed to satisfy one prong, it need not consider the other. *Id.* at 697.

Petitioner asserts he was denied effective assistance of trial counsel because his attorney generally performed in an inadequate manner at trial, failed to investigate, and failed to call witnesses. Petitioner does not indicate, however, the names of any witnesses or the proposed substance of their any testimony. Similarly, he does not identify in what manner any investigation that counsel failed to undertake would have assisted him. He does not indicate in what manner his defense attorney performed otherwise in a generally constitutionally inadequate manner. Under these circumstances, Petitioner cannot establish that he was denied effective assistance of counsel under either prong of the *Strickland* test.

*The Strickland* test applies to appellate counsel. *Burger v. Kemp*, 483 U.S. 776 (1987). Counsel must provide reasonable professional judgment in presenting the appeal. *Evitts v. Lucey,* 469 U.S. 387, 396–97 (1985). "'[W]innowing out weaker arguments on appeal and focusing on' those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy." *Smith v. Murray*, 477 U.S. 527, 536 (1986) (quoting *Jones v.* Barnes, 463 U.S. 745, 751–52 (1983)). Of course, not every decision made by appellate

12

counsel can be insulated from review merely by categorizing it as strategic. The Court of Appeals for the Sixth Circuit has identified the following considerations that ought to be taken into account in determining whether counsel on direct appeal performed reasonably competently:

> A. Were the omitted issues "significant and obvious?"
>
> B. Was there arguably contrary authority on the omitted issues?
>
> C. Were the omitted issues clearly stronger than those presented?
>
> D. Were the omitted issues objected to at trial?
>
> E. Were the trial court's rulings subject to deference on appeal?
>
> F. Did appellate counsel testify in a collateral proceeding as to his appeal strategy and, if so, were the justifications reasonable?
>
> G. What was appellate counsel's level of experience and expertise?
>
> H. Did the petitioner and appellate counsel meet and go over possible issues?
>
> I. Is there evidence that counsel reviewed all the facts?
>
> J. Were the omitted issues dealt with in other assignments of error?
>
> K. Was the decision to omit an issue an unreasonable one which only an incompetent attorney would adopt?

*Mapes v. Coyle,* 171 F.3d at 427–28.  This list is not exhaustive and need not produce a certain "score."  *Id*. at 428.

In sum, to establish a claim of ineffective assistance of counsel, Petitioner must show both deficient performance on the part of his appellate attorneys and prejudice from the deficient performance.  Petitioner cannot meet this standard here.  Petitioner asserts he was denied effective assistance of appellate counsel because his attorney failed to raise on appeal a claim of

13

ineffective assistance of trial counsel. Because his claim of ineffective assistance of trial counsel is without merit, this claim fails. Moreover, to the extent that Petitioner's claim of ineffective assistance of trial counsel relies on matters that are not readily apparent from the face of the record, such claims would be raised in a petition for post conviction relief, as previously discussed. Therefore, therefore appellate counsel cannot be deemed to have acted in a constitutionally ineffective manner in failing to raise these issues on direct appeal. Finally, Petitioner fails to identify any potentially meritorious issues his attorney should have been raised on appeal, but were not. He therefore cannot establish prejudice, as that term is defined under *Strickland.*

For all of the foregoing reasons, the Magistrate Judge **RECOMMENDS** that Respondent's *Motion to Dismiss*, Doc. No. 9 be **GRANTED** and that this action be **DISMISSED.**

**Procedure on Objections:**

If any party objects to this *Report and Recommendation*, that party may, within fourteen (14) days of the date of this report, file and serve on all parties written objections to those specific proposed findings or recommendations to which objection is made, together with supporting authority for the objection(s). A judge of this Court shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made. Upon proper objections, a judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the magistrate judge with instructions. 28 U.S.C. § 636(b)(1).

The parties are specifically advised that failure to object to the *Report and Recommendation* will result in a waiver of the right to have the district judge review the *Report and Recommendation de novo,* and also operates as a waiver of the right to appeal the decision of the District Court adopting the *Report and Recommendation. See Thomas v. Arn*, 474 U.S. 140, 106 S.Ct. 466 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir.1 981).

The parties are further advised that, if they intend to file an appeal of any adverse decision, they may submit arguments in any objections filed, regarding whether a certificate of appealability should issue.

s/ *Elizabeth A. Preston Deavers*
Elizabeth A. Preston Deavers
United States Magistrate Judge

Date:  January 28, 2014